I am Frederick Berry from Phoenix, Arizona. I represent the appellant plaintiff Vicente Prieto. From my perspective, I think there's two broad issues here. First of all is whether District Court Judge Strand erred in granting summary judgment in favor of the insurance company on the issues of bad faith and punitive damages. And secondly, after Judge Strand went on senior status and transferred the case to Judge Mergia, whether she made a mistake at trial in concluding that Dr. Prieto waived his right to receive one year of insurance benefits and she did this sua sponte. This was a bench trial. Yes, Your Honor. It originally was going to be a jury trial after, after the plaintiff lost bad faith and punitive damages, we stipulated to a bench trial at that point in time with Judge Strand, and the case was transferred to Judge Mergia. I think the first issue is resolved by analysis of what I consider to be the dispositive case in Arizona, which is the Zillage v. State Farm case. And in that case, the Supreme Court of Arizona very clearly set forth the fact that this fair debatability doctrine that the insurance industry has been advancing over the years is in most situations a jury question. And although under certain circumstances, a trial court judge can consider summary judgment in the absence of any evidence, I think the record here is full of very persuasive evidence from the records, the testimony, and particularly the affidavits of a bad faith expert, John O'Connell, who is very well respected, has a Ph.D. in insurance and teaches insurance, is a CPCU. And he said that Paul Revere was guilty of bad faith in various particulars, one of which was never even addressed by Judge Strand, and that is the lowball offer. We have an insurance claim that's worth about $850,000. Paul Revere came in at a time when they knew Dr. Prieto was in a cash crunch, and he knew at a time when it knew that he was desperately trying to go back to work, and offered him $25,000 not just to buy out the claim and sell the claim, but to buy out the entire policy. Here's an insured that has a diabetic wound on a policy he bought back in the early 80s. You don't have to be an actuary to understand that a person like this does not have a good prospect for recovery. But they offered him $25,000 right then and there on the spot to buy out his claim. I have a hard time believing that an offer of money that one can take or leave could be proof of bad faith. You don't like the offer? Say no, I don't like the offer. Give me $800,000. Give me $250,000. They offer you low, you respond with high, and that's how people trade bargains. Well, in an ordinary commercial ---- I don't know how this shows bad faith. In an ordinary commercial transaction, Judge, you're right. People dicker back and forth all the time, and that's business. No problem. But this is an insurance transaction where there's unequal bargaining power. And the commentators are all ---- What's unequal about it? Well, you have an insurance company worth billions and billions of dollars and an insured who has bought this safety net, he thinks, who is really down. It happens all the time. We're all constantly dealing with companies much larger than ourselves. True, it does happen all the time. But the point when it comes to this claim is it has an economic value, and he can just say no. The Supreme Court of Arizona ---- It's not like, you know, like he, I don't know, maybe he put food on the table and they had the mortgage or whatever. Say no. Get out of here. It's not enough money. Well, Judge ---- I just don't see it. The Supreme Court of Arizona disagrees. And in the Zillage v. State Farm case, which is stare decisis in this case, Judge Martone says that low-balling is bad faith. That's the law of Arizona. And this is low-balling, according to Dr. O'Connell. And I think it's low-balling to anybody that looks at it. A claim that's worth $850,000 offering $25,000, it's low-balling by any perspective. I think without going back and checking, I believe you'll ---- I'm willing to bet that what you'll find is that was low-balling payment of the settlement of the claim, not low-balling buying out the policy. Well, Your Honor ---- Those are very different things. If a company is on the hook for a claim and they low-ball that they're willing to pay a legal obligation, that's quite different from saying, look, we have a contract. We're willing to buy out this contract for you. That's not ---- they don't have any obligation to buy the contract at all. No, but the ---- Well, we find it economically feasible to do it, but this is not a situation where they had a legal obligation to buy out the contract. That's true. This is what Justice Martel was talking about, low-balling, a situation where the insurance company has an obligation to pay the claim and they low-ball. They low-ball on their obligation. But where's the obligation to buy out the contract? There is no obligation to buy out the contract, Your Honor, but under the circumstances, buying out the contract also buys out the claim. It would certainly have been great for the insurance company to be able to do it. Right. But this was not a situation where they had an obligation to pay and they say, oh, you know, we know we have to pay X. We're going to low-ball you just to force you into court. This was a separate transaction. This was saying, look, we know we're going to have some liability here. We'll just buy you out. You want to talk about something else? I mean, I'm not finding this very helpful. Well, I do think that, you know, I have to respectfully disagree with the Court that this is a clear case. But that's what Martoni was talking about, wasn't it? He was talking about low-balling a claim. Yes. The Zilich case was a claim. That's absolutely correct, Your Honor. I think you have to read the opinions to know that. But I'll tell you, Judge, as a matter of fact, the offer that was made in this case was to buy out the contract, which included the claim. In which case? Our case, Prieto v. Paul Revere. It's admitted in the answering brief. But at that point, was there a current obligation to they had just paid him, what, two months or three months of benefits? Well, they promised him three months, but paid him two months. So they did pay him some money. Right. And at that point, he had no pending claim. Well, he had told them that he was hoping to go back to work, and he expected, projected into the future, that he'd be able to return to work in a few months. And that was what was discussed in his home. But there was no pending claim. He was not at that point saying, okay, you've paid me for two months or three months, and I'm making claim for the future. I mean, he hadn't, after he had gotten that money, there was no claim pending. So it's not like, it's not like there are, it's not like there is some claim they're lowballing him on. The claim, excuse me, that Dr. Prieto made at that time, he expected only to be out of work for a few months. I think he expected to be out of work for a total of five months. There was a waiting period. But unfortunately, his rosy expectation of when he was going to be able to go back to work did not turn out. As was developed during testimony at trial, doctors so testified that he was continuously disabled for the entire period of time and permanently disabled. So his optimism, if he would walk in this courtroom today, he would come in and tell the court that he wants to go back to work and practice chiropractic. He's a very, very hardworking guy, and he's not doing this because he's made a choice to retire. He's making a claim, as he promises, contained in this insurance contract. And Dr. ---- Can I just clarify something? I want to make sure that you're not appealing the finding of no total disability.  Well, the trial court judge found that there was a total disability for a while, then there was a partial disability for a while, and then there was a total disability. Right. And that's not being appealed. We're only appealing, Your Honor, the issue of the summary judgment on bad faith and punitive damages. And the waiver. And the waiver issue. Okay. There's evidence in the record. Dr. O'Connell's affidavit goes on and on and on, pointing out specific issues where he believes that the insurance company acted in bad faith. Judge Scran addressed some of them, didn't address others. Roy Gill, who was the former chief examiner of the Arizona Insurance Department, testified by way of affidavit regarding the motivation, why Paul Revere would want to engage in bad faith claim handling. Motivation is always relevant, whether you're running a red light on the way to the airport or it doesn't make any difference. Paul Revere has lost $1.3 billion in writing these very liberal insurance contracts. It had, in the year this claim was denied, 139 percent combined loss ratio, which is ---- Some cases regarding Paul Revere's litigation. I only saw one where there was a finding of bad faith for the period after 1999. But I was wondering what that has to do with this case and how one could consider the evidence in that case in this case. Pattern and practice, Your Honor, which is relevant in ---- Don't you have to introduce that in this case? In the record before we get it? Well, we did have some evidence of pattern and practice through the testimony of a former Provident employee, Dr. Feist. And these were just additional illustrations of Paul Revere and his sister companies adopting a practice of turning down valid claims. It's epidemic throughout the country. It wasn't before the district court at that time, so it wasn't part of this record. No, that's correct. I just was having a hard time to know what I was supposed to do with those cases. Well, it was not before ---- You're right, Your Honor. Those cases were not before the district court below when it made its determination. That is correct. So to answer Judge Rossani's question, so what do we do with them? Well ---- If they're not in the record, what do we treat? How do we deal with them? What good do they do you? Well, I think that it may assist the Court in seeing the trend and the pattern and practice that Paul Revere and his sister companies are engaged in, in simply not paying valid claims. Whether you make any use of that or not is up to you. Well, if I wanted to make a use of it, what use of it could I make of it?  You've got 7 minutes and 54 seconds. I see that, Judge. Thank you. Would you like to sort of save that for rebuttal? Well, I'll think about that a little bit further. Maybe I can save that for rebuttal. Thank you. Okay. Let me address the issue of waiver. I talked about that in the briefs, but I want to bring up a new point that I thought of this morning. You know, waiver is an equitable remedy. And as an equitable remedy, it's invoked sometimes to favor an insured and an insurance transaction. Given the fact that insurance is vested with the public interest, that there is typically an unequal bargaining power between insureds and insurers, the doctrine of waiver being an equitable remedy is never used by the Court to allow an insurance company to avoid a contractual undertaking. For that, insurance companies have to look at the insurance contract and see what provisions in the insurance contract, or in some cases statutory provisions, allow the insurance company to defend a claim. I was a little confused on this waiver claim. Did he miss some deadline, contractual deadline with regard to this period? No, he didn't. Okay. He waited for nearly, it wasn't really a year, well, it was about a year, roughly, to go back to the insurance company and ask for more insurance benefits. During that year period, he had opened up his office, he had moved his office because he thought his client base, having been in South Phoenix, had moved north because he served the Hispanic community in Phoenix. He moved his office north, trying to catch up with his client base. This was his rationale. He did some advertising. He put out some flyers. But nothing like this worked. The reality, of course, is that Dr. Prieto had an amputated, a great portion of his foot had been amputated. It was twice the size, and that's in the record, twice the size of a normal foot because of a skin graft and muscle graft performed by Dr. So. His foot stunk. It was a festering, non-healing wound. He was on crutches or in a wheelchair, sometimes on a cane. And guess what? His patients left him. And he couldn't make a go of it. Some days he would have four patients. Some days he would have two. At the time his deposition was taken, he had one patient. But yet he still tried to make a success of his chiropractic practice. He was entitled to benefits. So finally, after about a year, he went back to the insurance company and said, I want to make further claim under my policy. And Paul Revere said, no, we're not going to pay you benefits, not because you're not disabled, because you probably are disabled, but because your chiropractic practice is in decline. And for that, which is, of course, nowhere found in the insurance contract. And for that, Paul Revere puts together some selected statistics. But it is really part of it. Because if his loss is from a decline not connected to his foot, they don't have to pay. Right? So that's what they're saying. This decline doesn't have to do with your foot. Well, that's what they said. In that sense, it is part of the insurance agreement. I mean, they didn't contract to pay for any old decline in business. They contracted to pay something that's related to his disability. So that's what they're saying, isn't it? It's not related to your disability. But it's factually 100 percent wrong. That's a different argument. But it goes back to summary judgment. You know, they drew a graph that made his practice decline like that by selecting months here and months there. When reality sets in, you draw a graph that we put in that his practice was only in de minimis decline. So Paul Revere lied to their insured and said, we're not going to pay your benefits because your practice is in decline. Lying to an insured is bad faith. In any court. And certainly it should be the law of Arizona. It is the law of Arizona. You know. You say he lied, but maybe that's how they saw it. I mean, they see, they look at the people coming in through the door. They count them and they say, look, your business is declining. How are they to know whether that's because his foot smells or because he just, people are, you know, they say he changed offices because his patients moved. You know, that can lead to a decline in practice having nothing to do with disability. Maybe by the time he moved, it was too late. Maybe they got a doctor at the new location that they liked better. They didn't do an investigation adequate to determine, which is a touchstone of that faith in Arizona. That's the law of Arizona. Can I ask what happened with what appears to be his lie, that he didn't go back to work until May when, in fact, he went back to work in March? They agreed, Your Honor, they being Dr. Prieto and the insurance adjuster, that he could attempt to go back to work earlier, not paying benefits anyway. These insurance companies want their claimants to go back to work to try to reestablish their claim. Okay. So they didn't pursue that because it was basically part of an understanding. I mean, talk about waiver. That's a good example of where waiver does work when an insurance company waives a condition, and they clearly waive that. And that's never been debated or argued or anything like that. Is that clarification? Yes. The bottom line here is that Paul Revere acted in bad faith. It denied a clearly covered claim, and they did so for monetary gain. They wanted to keep the money for themselves if they had promised to pay Dr. Prieto. You've got two minutes. Do you want to say anything about that? Yes, Your Honor. Thanks. Would it be all right to just start with waiver? Because I thought that was a more limited issue. I didn't get this. You didn't raise waiver as a defense. Is that correct? Yes, Your Honor. And for the record, I'm Scott Gales for Paul Revere Life Insurance Company. Thank you. With regard to waiver, that was an issue that was raised by the court, and as we've acknowledged in our answering brief, we think the court did that appropriately under Rule 15 of the Rules of Civil Procedure. We did not allege that as an affirmative defense. Okay. So she did that when the trial was over? Yes. Okay. So at no time during the trial was he, was your opponent given notice that waiver was being litigated? Well, it was argued, and it was argued in the sense that there was evidence elicited from Dr. Prieto, and this is in the brief. He discussed that year where he didn't go back to the company. Correct. His statements, and this was first in an affidavit submitted in the summary judgment briefing, which is at Supplemental Excerpts of Record, page 40. His statement was that he understood in April of 1996 when he talked to the insurance adjuster, that if he had a continuing problem, he should contact the company. His trial testimony was that he recognized that, yet he decided not to contact them because, in his words, he said, and this was in Supplemental Excerpts of Record at 68-69, I never wanted to involve them. In my mind, I didn't want to use them. So that evidence He's saying that. But how does that put him on notice that now there's an issue as to whether for all time, not for that particular period, but for all time, he is waived that you're arguing that he's waived that claim? That wasn't the argument or the court's finding. She ruled that he had only waived his claim for benefits for the period from the How does that put him on notice that for all time, you're arguing for all time, he has waived his benefits for that period, that his testimony in that way, how does that provide him notice that that's the big issue now? Well, he certainly knew in the trial that the company's position was he wasn't entitled to benefits for that period. But you had told him you weren't saying, you already said that you're not saying that there's a failure to notify the company claim under some time limit. Okay. So where's the notice? I'm not finding that notice. Is there anything else? Well, I think if you're asking was he given notice. So he can fairly defend the claim of waiver. Well, he certainly knew that the company's position, and this was argued in the case, that he was not entitled to benefits for that period because substantively he didn't qualify under the policy. Okay. But that's fine. He knows you're arguing that he's not entitled for that period because he substantively doesn't qualify. Correct. But how does he know that you're arguing or that he's supposed to defend against a claim that he never, that he cannot make a claim for that period because he's waived it? Because he knowingly and intentionally forgoed the benefits, which is what the trial court found in her conclusions of law. But isn't that a little bit contrary to his comment after the fact that he didn't apply for that year was gone into by the company's lawyer on cross or redirect. The his credos or ask him why he waited for that period of time. And his response was, I'm just was just following the instructions of Tom Jolicoeur. Now, that's quite contrary to a finding of waiver. He's saying the company representative told me some stuff. And by not, by not filing anything in that year or going back to the company in that year, I was simply doing what the guy said. Well, I think that would be a factual issue for the determination of the district court. And she, she had evidence, and this was also argued by Conso, but she had evidence based on Mr. Credos or Dr. Credos' testimony that he said that he understood that he could go back if he had any problems after the anticipated five months. And it was his trial testimony where he said what I quoted earlier, that he, he did not want to involve him. So to the extent Dr. Credo was inconsistent in his own testimony at trial, I think that was an issue that the district court properly could resolve. You, you, you do agree that it is a little bit strange to, I understand adding a theory in the middle of a trial, but after all the testimony is done and proofs are closed, to say, oh, by the way, you have also tried waiver, is a little bit strange because even if you let somebody in on the middle of the trial, you say, oh, well, if I knew that waiver was at issue, the other testimony, you know, the other thing I would have said that would have had a bearing on it, or I would have, or maybe presented another witness on this to, to, to show, you know, certainly what he said permitted an inference of waiver, but he certainly never said, and I intentionally and knowingly waived making this claim against the company because I, you know, didn't want the money even though I could have gotten it. He's never said anything like that. I mean, the most he said was, I was told I could go back to them if I had no problem and I'm an independent kind of guy, I didn't, and one could certainly infer waiver from that, but it's not the only, it's certainly not unequivocal, and I can certainly imagine that one could, that he could have continued that train of thought if he'd known waiver was the issue and said, well, of course, I assume that if I waited, I wouldn't lose any rights. I was hoping to make it on my own, but I certainly had no intention at all of giving up any rights I had against the company by doing that. If he had said that, that would look a lot less like waiver, wouldn't it? Well, two points. First, I don't think the evidence on the waiver issue would have been any different had that been affirmatively alleged in the pleading. Well, I know that, that's your hope, but that's your... But as you know from having been a lawyer many years, lawyers on the other side often surprise you with what they can come up with. You know, you sort of sit there saying, gee, they'll never come up with anything and bam, you get to trial and you find out they did come up with something, something you didn't expect. So we don't really know what, I mean, the fact that your best hope is that they would have come up with nothing else gives me very little comfort. Well, the question was whether he, whether he knowingly and intentionally declined to seek the benefits and that had been... Whether he knowingly, intentionally gave up rights permanently that he knew he had. That's really the issue. Then by saying, I am not going to go in now because I'm hoping to make it on my own. Did he know that that money will never come back to him even if it turns out he didn't make it on his own? Well... Then by just sort of waiting, he wouldn't be able to go back and say, oh, well, I tried on my own, but now we're on the money on our own. That's really the issue. And he certainly says nothing like that. He certainly says nothing like that. But what he did testify to, and this was both in his trial testimony... You agree with, you're agreeing with me. He didn't... But you, you, you, I am right when I say he said nothing like that. Correct. But what he did say, and this is what supports the district court's conclusion of law, what he did say is that he understood that if he wanted benefits because he thought he was disabled beyond the expected five months, he should go back to Paul, Paul Revere. And when he was asked in his cross-examination, why did you not do that? His testimony was that he did not want to involve you. I did not want to involve you. And what if, what if now realizing that the issue of waiver was on the table, counsel on the record said, and by doing that, did you understand and did you know and did you mean to give up these benefits forever? And he said, oh, no, no. I was simply thought I was delaying things in case things got much better for me. But of course, I thought that if things got worse, I would be able to go back and get my benefits. I certainly didn't mean to make a gift to the insurance company. But what if that had been his answer on a redirect, which is, which is very likely what his answer would have been if, if counsel had asked that question? Well, again, I think... You think what? I mean, isn't that the problem with trial by ambush? By having a district court come along after all the proofs are in and invent a theory and say, oh, now we have all the evidence and based on what we have, I'm now going to make a finding on a theory that neither side was aware of that they were trying. Well, on the other hand, I think what Rule 15 contemplates is... When you say on the other hand, that means, yes, you agree with me, but on the other hand... Maybe I chose the wrong phrase. Well, why don't you ask the question I had? Isn't that the problem with it? If the shoe were on the foot and if the district court has found that Paul Revere had waived an objection based upon these conversations and it costs Paul Revere thousands of dollars because of this waiver that you never had a chance to know you were trying, you'd be out here yelling bloody murder, wouldn't you? Well, let me... Yeah, it would, it would, wouldn't you? No, I think what Rule 15 contemplates... You take it like a man? Pardon me? You take it like a man? You wouldn't let him, you'd say, oh, well, yeah, we have it coming? I think what this boils down to, what the whole questioning boils down to, is did the Because Rule 15 says, regardless of what the pleadings say, if an issue is tried by the express or implied consent of the parties, you can form your rulings to that. You treat the issue as if it had been raised in the pleadings. And that's what we argue happened here. And I think our debate is, could the district judge properly treat this as an issue that had been... Prior to this case, when I had read the concept of implied consent, express consent, of course, you know what it means, is that the parties were actually aware of it. And although they didn't come out and say, oh, we're now trying waiver, it's obvious they're trying waiver, because they're asking questions about waiver. They're saying, you know, did you waive? Did you do this? There's no evidence of that here. The evidence that the plaintiff testified, he didn't go back to the insurance company. You know, he was asked, why didn't you go back and make these, you know, claims when you were... He said, I didn't do it because I was an independent kind of guy. I was hoping to make it on my own. Eventually, he did go back and make the claim, right? Yes, Your Honor. Okay. So that kind of cuts against the fact that he wanted to waive these from all time. And he did make the claim. Well, I... I mean, you got to a trial because he made a claim and it was denied, right? I think you... Well, is that true? Well, I disagree that it cuts against the fact that he... Okay. Well, just, how about we'll just deal with the fact then. He did finally make the claim, and it was denied, and that's why you had a trial. You can't even agree to that, huh? Well, I think the chronology has been a little confused in the discussion. It's important to keep it clear. In the spring of 1996, in April, after his first surgery, after he had his toe amputated, he met with the insurance investigator, said that he thought his disability was going to last five months. And that's when he understood that if it did continue, he should go back to Paul Revere. Now, 15 months later, in August of 1997, he again contacted the company. And at that point, they said, send in a written letter. He did so. He sent a letter in September, and he said, one, he said he continued working, and he said he would like to be considered for total or partial disability. Now, the question of whether his failure to ask for benefits for that interim period, whether that constituted waiver as a legal matter, I don't think depends on whether someone said to him at trial, did you intend to wait? I think the judge was acting appropriately when she concluded the parties had, by implied consent, tried that issue. I don't think anybody's saying that he had to use the magic word, but it's important for the lawyer who's trying the case to be aware of the legal theory being tried, understand what are the key elements of the legal theory, and ask questions. I mean, I'm sort of giving, again, shortcuts, saying, oh, did you waive? But there are all sorts of things a counsel can ask if he's aware that we're trying waiver that would help buttress the claim of waiver in your case, and help undermine the claim of waiver on another case. And if neither side is aware of this, and the district court, you know, then afterwards says, oh, well, you know, guess what, guys? We just tried waiver. Surprise, surprise. Somebody's going to be surprised, in fact. That's what it sounds like to me. There's nothing about this transcript that suggests that lawyer on either side was aware that that was the issue being tried. And I'm not sure how you can have implicit consent, much less explicit consent, to try an issue that neither side is aware is being tried. Well, it is, it is, it is true. Did you know? No. Were you aware? The arguments that Anthony tried counsel? I wasn't trial counsel. And what I was about to say is, oh, you'll try waiver? The company's argument was that he, it was for, no, it was for a different reason. There we go. But the. When he finally, when he did ask the company for money. Yes. Did he ask for money for that one year period, August to August? That was part of his claim against the company? When he, when he came back in 1997, he, he said he wanted to be considered for partial or total disability. And he ultimately, as his claim was evaluated, was arguing that he had been totally disabled from February 1996, the time of his first amputation. Now, the company's position was, well. But that, that, his claim then, when he says, I've been totally disabled since February of 96, forward included this August to August year that the waiver. Yes, yes. So the company at that time knew that he was, had not, at least when he told the company that in 98 or whatever that was, that he didn't then think he had already waived it. Well, and you're right. And the company's response in, in reviewing that claim was not that he had waived it. And this is in the letter that's at pages 61 and 62 of the supplemental excerpts. But in, in June of 98, when the company advised him that it didn't believe he was covered, it said, you're not totally disabled because you've continued working. And indeed, he continued working from the time he went back to work in March of 96 into 1999. So he was not totally disabled for that reason. The reason the company said he was not entitled to residual disability was its belief that his practice had been declining for reasons independent of his medical condition. Okay. Now, the other question I have, as long as we're staying on waiver, is, I think, as I remember the law school definition of waiver, is the intentional relinquishment of a known right is shorthand for, for waiver. What's the burden of proof on the party asserting waiver as a defense in a case like this, particularly where it would be the insurance company asserting waiver against the insurer? Is it just a plain old burden, or is there a little higher burden as an equitable defense in that situation? I believe it's a preponderance, Your Honor. I have not seen any law that suggests that apart from the general burden for waiver, it would be different in this context. But I, I have to admit, that's not an issue that we addressed in the briefs. In the 54 minutes, seconds left to you, the District Court got the law on, on, on, on, you know, the zillage came down and the bad, the bad faith, I mean, it just blew it and blew it for reasons understandable enough. The law was not yet established, but shortly after the District Court ruled, the Supreme Court came down with a big, big opinion, which looks to me like it says this is the kind of thing had better go to a jury. Right? No. And, and can I, if there are three points, I think I can address that question. Okay. Go ahead. First, the, the District Court here recognized that the mere fact that a claim is fairly debatable is not dispositive of a bad faith claim, because if an insurer, apart from that, acted unreasonably in the investigation or handling or processing of a claim, and recognized that it was doing so, that also would be a basis for bad faith. And that's what zillage recognized. What's the investigation that, that, that Apollo v. Abdu on this claim? Well, if you, and again, the District Court's order describes this at pages 168 and 169 of the excerpts of record. But promptly after Dr. Prieto made his second claim in 1997, they sent an investigator out, they requested the medical records, they requested his business records, and they then evaluated that information. They responded to Dr. Prieto the following spring. And said no. Yes. But there wasn't evidence. The guy's got documented diabetes. He's had his foot cut off. In the middle of a trial, he gets another amputation. He's deteriorating. He can hardly walk. And the company says, well, you're using customers because, because what, people's backs have gotten better all of a sudden? Because of the rash of improved posture in Arizona? No, Your Honor, and it was actually Dr. Prieto himself who had given the company the information about the decline in his business. And this was shown not only in the field investigation in 1997, but in the April 1997. The guy's falling apart. He's in a business that involves sitting there getting close to people, manipulating their bodies. And he himself is physically falling apart, literally. They're cutting away chunks of his body. And he's got gangrene or whatever it is, smells. And of course he's not going to get, he's going to lose patience. The investigation, and this is in the letter that's in. I don't think a jury would have liked that. I think the reason you didn't want to go to the jury is that you think the jury would have slammed you hard, your client. This is the kind of case you don't want to take to the jury. I mean, if you'd been so proud of the way it was handled, you would have been happy to go to a jury. I'm not sure. Are you asking? I'm saying you asked not to go to a jury. You said this should be this way. Once the summary judgment ruling was made, as Mr. Berry stated, the parties stipulated to advance trial. Now, as far as Zillage, my first point was the district court. But if the district court erred on that, you'd get, there'd be a jury trial on that, wouldn't there? You know, I can't speak to what would have happened had the motion been denied. I understand, Mr. Gershwin. No, no, I'm talking about reversing. Oh, yes. This would go to a jury. Well, procedurally, if you reversed and it went back down, I think, well, I don't know. I don't know where procedurally that would leave us, given the prior trial and you'd want a jury, I'm sure. What were you trying to say about Zillage? I'm sorry. There were, the other two, the three points were that, first, Judge Strand's ruling, because he did recognize that fair debatability is not dispositive, it's consistent with Zillage. Second, after Zillage came down, the plaintiff asked Judge Strand to reconsider in light of Zillage, and that was denied. There's an order by the Court in July of 2009, a request for reconsideration. So it's not as if the district court was oblivious to Zillage. And then, finally, you know, in a way, that's an academic point, because, obviously, you need to assess de novo whether summary judgment was appropriate on the record before the district court, at the time the motion was considered. Applying Zillage, though. Yeah. And Zillage itself is not a bar to summary judgment in bad faith claims. What Zillage says, and this is consistent with what the district court did in this case, is, look, is there, for purposes of bad faith, evidence that the insurer acted unreasonably in its investigation or processing of a claim, and that the insurer knew or was conscious of the fact that attacks were unreasonable? And I think if you look at Judge Strand's order, which is at 168 and 169, pertinent parts of it are at those pages, you'll see that he applied that analysis. So for the reasons we've explained, we urge you to reform your district order. Okay. Thank you. The evidence of bad faith, other than that $25,000, is the testimony of the witness about Paul Revere's practice of trying to deny all claims possible, and the, what   they say was phoned-up evidence of the decline in the business. The evidence of bad faith, according to Dr. O'Connell, was that Paul Revere said it would only pay three months of benefits, said it would pay three months of benefits when it only paid two. It fixed that the day after Dr. O'Connell's opinions were disclosed. Further evidence of bad faith is told, Paul Revere told the plaintiff that the claim was settled in full when it was not settled in full, that the insured had further contract benefits after that time. Dr. O'Connell also said that it was bad faith for Paul Revere not to explain recurrent and concurrent claim benefits in the insurance contract. He also said it was bad faith, as you pointed out, Judge, that the business was in decline, which was just completely false. He also said it was bad faith to tell the insured that his eligibility for receiving benefits was contingent upon him being able to return to work. The reality is, is that the insurance contract allows for him to file a partial disability claim, a residual disability claim. Mr. Jolicure, in his report, with his contemporaneous note, says that he told Dr. Prieto that he can file further claim if his infection prevented, infection prevented him from going back to work. And Dr. Prieto testified that that's why he didn't file further claim. Now, Dr. Prieto also testified, as counsel has said, that he didn't file further claim because he was hoping to get better. I mean, wishful thinking. People, people are really, most people truly are motivated to go back to work, in my belief. He also said it was bad faith to lowball. And this case has so many parallels to the facts in Zillage that I find it very interesting. Judge Martone, who wrote the opinion, is now on the Federal bench in Phoenix. I hope that enhances his credibility. I don't know if it does or not. But he wrote that opinion, and he said that lowballing is bad faith. And there was lowballing in that case. There was lowballing in this case. Lowballing is unethical. It's indefensible. It should have never happened. The reason insurance companies lowball, and the reason it's considered unethical and bad faith claims handling is because the insurance company is hoping to take a desperate person and settle a claim for peanuts. And that's what Paul Revere was trying to do here, because it lost hundreds and hundreds of millions of dollars selling these extremely liberal contracts. And now it's going to have to pay the piper. Roberts. Thank you. May I suggest this is lunchtime, and counsel are here. We're in Pasadena, but we have many fine restaurants. This may be a good time for counsel to get together and talk settlement. You've heard our questions. You sort of know more about the case than you did this morning. And I think this is the kind of case where everybody might be better off if you manage to work out an amicable settlement. May I recommend the Parkway Grill, one of many nice restaurants in Pasadena. But anywhere. Lucky Boys, you know, outside dining. And if you all, after this conversation, decide that you would like to have more time, we will defer submission. Just send us a letter, tell us you're engaged in serious negotiations, and we can defer submission. I'm going to ask if they were contacted by the meat issue. Were you ever contacted by the mediation unit? Yes, Your Honor. We were contacted by the mediation unit and conferred with it. But you didn't. Did you have an actual mediation or did you know we never had a mediation? Well, you now know more than you did when you walked in. I hope that this council would not only talk about also listening to realize that there's lots of latitude. The case could go any which way and could last for many more years. I might say that I've been told by some really, really good lawyers that our mediators are the best they have ever encountered. And I've seen him settle some cases that you wouldn't believe us if we told you. So if you think there's any opening at all, you can always go back to the mediation unit. You know what, I will defer submission until Monday. And if I hear by closing business Monday that you have either entered negotiations or you've contacted the media, just the media will let us know. I will then continue deferring submission. I just strongly urge you to do that. I think there's significant exposure on both sides. And you've heard our questions. You should you should. If you're realistic about your position, you will know that nobody came out clear when I hear. So following Monday, this. OK. But I still recommend lunch here. Quite good.
judges: Kozinski, Tg Nelson, Restani